IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Kirk Thompson,                          :
                    Plaintiff           :      Civil Action 2:08-cv-00701

        v.                              :      Judge Marbley

Michael J. Astrue,                      :      Magistrate Judge Abel
Commissioner of Social Security,
                    Defendant           :


## REPORT AND RECOMMENDATION

Plaintiff Kirk Thompson brings this action under 42 U.S.C. §§405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security denying

his application for  Social Security Disability and Supplemental Security Income

benefits.  This matter is before the  Magistrate Judge for a report and recommendation

on the parties' cross-motions for summary judgment.

**Summary of Issues.** Plaintiff Kirk Thompson asserts he became disabled in 2001

at age 35. In April 2001, Thompson was injured at work. While carrying drywall, he fell

off of a porch and sprained his left ankle. Thompson subsequently developed reflex

sympathetic dystrophy ("RSD") in his ankle. Dr. James J. Sardo, Thompson's treating

pain specialist over a period of over four years, concluded in August 2005 that plaintiff

was permanently and totally disabled. Dr. Janet L. Clark, Thimpson's treating

psychologist, found that he suffers from persistent depression that markedly limits his

ability to maintain concentration and attention over time. He is extremely limited in his

ability to withstand the stress and pressures of day-to-day work. Nonetheless, the

administrative law judge found that Thompson retained the ability perform, simple, repetitive unskilled work that requires no more than superficial contact with supervisors, co-workers and the general public.

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge's erred in evaluating the opinions of the treating pain specialist and the treating psychologist; and,
- The administrative law judge failed to properly evaluate Thompson's allegations of pain.

**Procedural History.** Plaintiff Kirk Thompson filed his application for disability insurance benefits on October 27, 2003, alleging that he became disabled on April 28, 2001, at age 35, by reflex sympathetic dystrophy in his left ankle. (R. 61, 65.) The application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. On September 12, 2007, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified. (R. 500.) A vocational expert also testified. On September 28, 2007, the administrative law judge issued a decision finding that Thompson was not disabled within the meaning of the Act. (R. 25.) On May 30, 2008, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security. (R. 5-7.)

**Age, Education, and Work Experience.** Kirk Thompson was born August 11, 1965. (R. 61.) He has a high school education. He was in a program for the learning

disabled. (R. 71.) He has worked as a truck driver. He last worked in May 2001. (R. 65.)

**Plaintiff's Testimony.** Prior to his injury, Thompson worked in construction. Thompson testified that he was injured while carrying drywall. He stepped down off of an unfinished porch and broke his ankle. As a result of his injury, he has to constantly prop up his leg or it swells and turns red. The RSD has progressed from his ankle to his calf. He testified that he is in constant pain.

Thompson testified that he spent his days laying in bed. He does not go out of the house more than two times a week. He can only drive for a very short time. He lives in a trailer park by himself. His eighty-five year old grandmother helps him with grocery shopping, housecleaning, and doing laundry. He is able to cook microwave meals for himself. When he goes grocery shopping with his grandmother, he has to use a wheelchair because he cannot stand for more than five or ten minutes at a time. Even with the use of a cane, he cannot stand for very long.

He used a spinal cord stimulator for a trial period, which seemed to help, but he has not had a permanent one. Thompson testified that he has tried all sorts of things in an attempt to return to work. He applied for jobs at different businesses, but no one would hire him. He has been through vocational rehabilitation, but it was not successful because he could not manage to participate in the retraining course.

Thompson testified that his health had deteriorated. He had gained a lot of weight, and he suffers from terrible depression. He believes his future is bleak.

Thompson reported that he sees a psychologist. Although he has made progress, he still needs to work on being around groups of people, trying to visit his family, and getting out of the house.

Thompson testified that side effects from his medications include constipation, drowsiness, nausea, and trouble sleeping.

Thompson pays people to care for his yard and perform maintenance on his car. Thompson testified that he has to use a wheelchair because he is in constant pain. RSD makes his foot hypersensitive, and the slightest pressure causes swelling and agony. On a scale of one to ten, his pain is usually at a nine. Even with the use of pain medication, his pain does not fall below a seven on that scale. The RSD is affecting his whole body. He takes steamy hot baths three times a day. He spends his days in bed with his foot propped up. He can only walk ten feet with the use of his cane. His leg swells and turns blue and purple. His leg also becomes numb and changes in temperature. He is only able to sleep three to four hours a night. He cannot bear to have any kind of fabric or blanket touching his feet.

He can wash just a couple of dishes at a time, and he does his laundry while sitting on a stool. He can walk up the three steps to get into his trailer, but it is difficult for him to do so.

Thompson also has anxiety and is distracted and irritable when around groups of people. (R. 506- 31.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record.  This Report and Recommendation will only briefly summarize that evidence.

**Physical Impairments.**

Martin J. Andrews, M.D. On June 28, 2001, Dr. Andrews performed a pain assessment. Thompson had a great deal of pain on palpation, and swelling was noted. He had some symptoms of hyperesthesia and allodenia. No discoloration was present at that time. Dr. Andrews recommended that Thompson undergo a three-phase bone scan and an MRI to determined the presence of reflex sympathetic dystrophy. (R. 169-70.)

On August 17, 2001, Dr. Andrews indicated that the three-phase bone scan showed non-specific changes, and the MRI showed either some bone bruising or microfracture of the talus with small joint effusion. Dr. Andrews administered the first of two lumbar sympathetic blocks, which provided 50% relief of his symptoms following the injection.  (R. 107.)

On October 18, 2001, Dr. Andrews concluded that plaintiff's reaction to the diagnostic lumbar sympathetic blocks was indicative of reflex sympathetic dystrophy. Dr. Andrews administered a lumbar epidural sympathetic block. (R. 105.) On October 26, 2001, Thompson reported that he had about three days of relief after the last injection. The coloration of his leg and swelling had improved. (R. 104.) Following his fourth lumbar sympathetic block, Dr. Andrews noted that plaintiff only obtained a

couple of days of relief after each injection. Overall, he had shown no improvement. (R. 103.) On November 16, 2001, Dr. Andrews indicated that plaintiff had probably received about twenty percent relief of his symptoms with the blocks. A second MRU revealed dystrophic ossification and mild spurring and inflamation throughout consistent with sequela of a prior strain. There was no evidence of OCD or loose body. The appearance of his foot was about the same, and he walked in a guarded manner. (R. 102.)

Thomas H. Lee, M.D. On January 8, 2002, Dr. Lee began treating plaintiff. Thompson reported that his pain was severe and limited his function of daily and recreational activities. He had severe difficulty on uneven terrain, stairs, inclines, and ladders. He had an obvious limp and could walk less than one block before his symptoms began. Walking worsened his symptoms, and elevation and rest improved them. On physical examination, his skin appearance had normal development and was warm with good turgor. Swelling was localized to the affected area. He walked with an antalgic gait. Exquisite tenderness was noted, and the pain was nearly out of proportion. There was a hue of redness and some sympathetic shine to his skin. Pulses were present at PT/DP 2+ bounding, equal, and regular. Sensory examination was intact with protective sensations. He had normal strength and tone. (R. 121.)

Dr. Lee diagnosed left ankle arthrofibrosis and left ankle reflex sympathetic dystrophy. He recommended surgery to remove a possible trigger site that was inter-

articular with his ankle joint. Thompson also had an impingement lesion and a great deal of fibrosis, removal of which could remove the trigger. (R. 121-22.)

The Ohio State University Medical Center. On March 7, 2002, Thompson underwent a left ankle arthroscopy with extensive debridement and a partial excision of the tibia. (R. 112- 14.) Thompson had significant arthrofibrotic changes of the left ankle as well as a component of reflex sympathetic dystrophy. Preoperative x-rays and MRIs showed some impingement lesions in the anterolateral gutter. On intraoperative exposure, there was significant scar tissue in the anterolateral gutter, which was removed in its entirety. An anterior tibial spur with some reactive synovitits was also removed. (R. 112.)

Following the surgery, Thompson had mild swelling around the ankle. (R. 119.) On April 9, 2002, Thompson had hyper-sensitivity after the removal of the cast. *Id.* Dr. Lee noted that inter-operative findings included a massive amount of fibrosis and scarring on the anterolateral impingement lesion. *Id.* On April 29, 2002, Thompson reported excruciating pain. The ankle had good alignment with joint space well maintained. There was minimal to mild swelling around the ankle. *Id.* On May 17, 2002, plaintiff was still unable to ambulate while bearing weight on his foot. Examination showed changes in skin coloration and cool skin temperature of the left lower extremity. He experienced pain with light touch throughout the foot and ankle. *Id.*

On June 11, 2002, Dr. Lee indicated that Thompson was doing very poorly. Although he had some sensation within his ankle joint, he still had exquisite

hypersensitivity and skin discoloration secondary to the underlying RSD. (R. 118.) On August 13, 2002, Dr. Lee described plaintiff as miserable. He had exquisite hypersensitivity and allodynia. Thompson complained of a cutting sensation within his ankle joint. *Id.*

On April 1, 2003, Dr. Lee noted that Thompson continued to do poorly. Hypersensitivity and pain was present. He had the stigmata of RSD skin discoloration, temperature changes, and hypersensitivity. Dr. Lee recommended a MRI to evaluate the soft tissue structures. (R. 117.) After reviewing the MRI results, Dr. Lee referred plaintiff to pain management, as no further orthopedic intervention was recommended. (R. 116.)

James J. Sardo, M.D. On July 31, 2002, Dr. Sardo evaluated plaintiff. (R. 154-56.) Plaintiff described his pain as a constant aching, throbbing, shooting, stabbing, sharp, tender, burning, penetrating, nagging, numb sensation in the left ankle. He also reported continued back pain after the epidural shots. On physical examination, there was no evidence of any swelling, effusion or redness in the region of the left ankle. He had some slight movement of the toes on the left foot. He had allodynia to light touch and pinprick from below the knee into the foot. There was a slight discoloration to the left foot.(R. 155.)

On August 27, 2002, Dr. Sardo noted that plaintiff had trouble with most activities of daily living. He also had difficulty sleeping. Thompson ambulated with a cane and used a wheelchair for long distances. He had swelling and sharp pains in his left ankle in addition to numbness and tingling. Dr. Sardo diagnosed left lower

extremity RSD and depression. (R. 153.) On October 22, 2002, Thompson reported that his pain was a ten on a ten-point scale. (R. 152.) On November 19, 2002, Dr. Sardo indicated that plaintiff's depression was worsening. (R. 150.)

On December 17, 2002, Thompson reported persistent pain. He was no longer wearing a cast boot, but he had an ankle brace. He had some increased swelling. He had difficulty taking his pain medication because he was driving a lot. On examination, his gait was antalgic, favoring the left leg. He was tender in the left lower leg. There appeared to be about 2+ edema in the left lower leg. (R. 149.)

On January 28, 2003, Thompson had a new brace for his left ankle and heated socks. His pain increased with walking, standing, and driving. The pain lessened when he propped up his foot or soaked it in hot water. (R. 147.) On March 25, 2003, Thompson reported similar problems with activities of daily living, including walking, sitting, lying, bathing, dressing, and driving. (R. 145.)

On April 22, 2003, Thompson reported that Vicodin 4 helped. He continued to walk with a cane. He used an RS4 stimulator, which helped somewhat although he developed some tingling in his toes. (R. 142.) On May 20, 2003, Thompson identified his pain as a ten on a ten-point scale. He continued to wear a left ankle brace. (R. 141.)  On June 17, 2003, Thompson indicated that he had difficulty continuing with vocational rehabilitation because of persistent pain. Dr. Sardo noted that plaintiff's depression was worsening. (R. 140.)

On July 22, 2003, Thompson reported that his pain was aggravated by walking and cold air, and it improved with resting, propping up his foot, or by not walking. He used a cane for ambulation. (R. 139.)

On September 9, 2003, Thompson complained of both his feet turning blue and increased pain. On examination, his feet were warm, and there was no swelling. There was a very minimal amount of ecchymosis just distal to the medial malleolus on the right side. He wore a left ankle air splint. (R. 130.) On September 16, 2003, plaintiff reported having frequent panic attacks. (R. 129.)

On October 14, 2003, Dr. Sardo noted that plaintiff was continuing to experience pain in his right foot. (R. 125.) On November 11, 2003, plaintiff reported that he continued to smoke and that he tried to walk around his house. (R. 124.)

Dr. Sardo continued to treat plaintiff from December 9, 2003 through June 28, 2007. (R. 346-351, 378-92.) On October 7, 2004, there was no evidence of any swelling or color change, but there was allodynia to light touch. (R. 351.)

On November 4, 2004, Thompson reported ongoing pain across his lower leg. He struggled with insomnia and constipation. Thompson was instructed to continue using the ankle brace and cane for walking. (R. 239.) On December 30, 2004, plaintiff reported that his pain was a seven on a ten-point scale. He indicated that the medication was helping with his pain and allowing him to function. He continued to smoke a pack of cigarettes a day. Thompson used a wheelchair for going any distance. (R. 240.) On February 24, 2005, Thompson reported that he had increased swelling a few days ago.

He rated his pain as an eight. On physical examination, his left lower limb was warm, and there was fairly good color. Allodynia was present. His peripheral pulses were intact, He had minimal movement of the left ankle. (R. 241.)

On April 7, 2005, plaintiff's pain level was at a nine. Thompson had been experiencing a burning sensation in his left leg. (R. 242.) On May 26, 2005, Thompson reported that he had been taking extra medication because it had not been providing as much relief. (R. 243.) On June 23, 2005, Dr. Sardo continued to report that the medication kept plaintiff functional. Thompson used a wheelchair when grocery shopping. (R. 244.) On July 21, 2005, Dr. Sardo indicated that plaintiff was undergoing whirlpool treatments and therapy. There was a mild duskiness to the left foot. (R. 245.)

In an August 3, 2005 letter to plaintiff's attorney, Dr. Sardo stated that Thompson's prognosis was poor and that he was permanently and totally disabled. (R. 237.)

On August 3, 2005, Dr. Sardo completed a medical assessment of Thompson's ability to do work-related activities. (R. 332-45.) Dr. Sardo opined that plaintiff could occasionally lift and/or carry five pounds, and he could frequently carry zero pounds. He could stand for a total of a half hour during an eight hour workday, and for five minutes without interruption. He could sit for a half hour without interruption and he could sit for a total of one hour in an eight-hour day. (R. 333.) Plaintiff needed to keep his foot elevated. (R. 334.) Dr. Sardo also indicated that Thompson should avoid heights, moving machinery, chemicals, temperature extremes, vibration, noise, and

humidity based on his unstable gait or that it would result in increased pain. (R. 335.) He concluded that plaintiff did not retain the residual functional ability to perform sedentary work. (R. 336.) In response to interrogatories, Dr. Sardo stated that depression has negatively impacted plaintiff's recovery and that pain is an emotional and sensory experience. (R. 339.)

On August 18, 2005, plaintiff had some mild duskiness to the left foot and leg. The skin blanched with pressure. There was mild allodynia at the dorsum of the left foot. Thompson reported increased muscle spasms. His depression improved when he had been out of the house. (R. 247.)

On May 30, 2006, Dr. Sardo indicated that there was discoloration of the left leg and foot and some hyperesthesias on the dorsum of the left foot. (R. 382.) On November 28, 2006, plaintiff reported a constant throbbing, steady, aching pain in his left leg. The medicine kept him only somewhat functional and he experienced breakthrough pain. (R. 380.) On February 22, 2007, Dr. Sardo noted that plaintiff was experiencing symptoms in his right leg. (R. 379.) On June 28, 2007, Dr. Sardo indicated that the spinal cord stimulator trial had provided Thompson with significant relief. The plan was for a permanent stimulator placement. (R. 378.)

Fayette County Memorial Hospital. On September 26, 2003, Thompson presented at the emergency room with complaints of coldness and blue discoloration of both feet. Although he had RSD of the left foot, he knew of no injury to the right foot or ankle. Thompson also reported increased pain and paresthesia to both feet. There was

ecchymosis or a dusky appearance over the right medial malleolus as well as over the left lateral malleolus. The toenails also had a dusky appearance. Thompson had good range of motion of the right foot and ankle and toes. There was markedly decreased motion in the left foot secondary to his previous injury. He was strongly encouraged to avoid smoking as this would cause increased vasoconstriction in his extremities. (R. 131-32.)

In an October 1, 2003 letter, B. Mohan Das, M.D., wrote to Dr. Sardo regarding Thompson's vascular examination. Dr. Das did not see anything abnormal in his arterial, venous, or lymphatic system from a vascular standpoint. Dr. Das could not provide Thompson with any treatment from a vascular standpoint. (R. 126.)

<u>Susheel S. Kakde, M.D., FACEP</u>. On January 23, 2003, Dr. Kakde performed an independent medical examination. (R. 173-77.) Thompson reported that he could not walk prolonged distances. Driving also caused him pain. Propping up his foot and using hot water provided some relief. He could not play with his children outside.

Plaintiff walked with a slow, deliberate, stiff gait. On physical examination, the left ankle was very tender to touch, but there was no swelling, redness, or deformity. The left lower leg girth was rather decreased as compared to the right. The left ankle and foot were rather reddish, but there was no shine to the skin. Range of movement of the left ankle was pretty much non-existent. (R. 175.)

Dr. Kakde opined that plaintiff could not return to his former employment. (R. 177.) He believed that Thompson could perform sedentary work that would allow him

to sit/stand/walk at his own discretion and lift or carry no more than 5-10 pounds occasionally at the waist level. He recommended plaintiff start by working two hours per day and increase the hours as tolerated. (R. 177.)

<u>William R. Kelley, M.D.</u> On January 29, 2004, Dr. Kelley reviewed the medical record for the Commission and made a physical residual functional capacity assessment. (R. 187-91.) Dr. Kelley opined that Thompson could occasionally lift and/or carry 20 pounds and frequently carry 10 pounds. He could stand and/or walk about 6 hours in an 8-hour day. He could sit with normal breaks for about 6 hours in an 8-hour day. His ability to push and/or pull (including the operation of hand and/or foot controls) was unlimited. (R. 188.) Dr. Kelley noted that although plaintiff claimed he had RSD in his left ankle and experienced difficulty walking, bad balance, muscle spasm, color changes, pain, swelling, and pain while driving and in the cold, his allegations were not supported by the evidence. Dr. Kelley noted that there was no degenerative joint disease of the ankle, and there were no current skin color changes. Dr. Kelley stated that Thompson was evaluated by a foot specialist who does not think that he has RSD based in [sic] the current MRI findings."[1] Dr. Kelley indicated that plaintiff did not require a cane. He had tenderness of the lower extremity in a non-anatomical pattern. (R. 188-89.) Dr. Kelley indicated that Thompson could never balance, but he could occasionally crouch (R. 189.)

---

[1]Dr. Kelley is apparently referring to Dr. Lee's July 3, 2003 office notes, which do not support that assertion. Dr. Lee stated that Thompson did have RSD: "I do think he is suffering from reflex sympathetic dystrophy based on his MRI. . . ." (R. 116.)

On November 30, 2004, Gary E. DeMuth, M.D. reviewed the evidence of record and concurred in Dr. Kelley's assessment. (R. 191.)

Lisa F. Lichota, D.O. Thompson was treated by Dr. Lichota from April 19, 2004 through August 23, 2004 for pain management. (R. 217-35.) On initial examination, Thompson's left lower extremity was quite tender to touch. There were changes in the nail beds, and the left foot was reddish in color. The left ankle was smaller than the right. Dr. Lichota diagnosed RSD of the lower leg and ankylosis. She also believed that his depression and anxiety were a factor in his symptomatology. (R. 234.) She referred Thompson to physical therapy. (R. 224-25, 261-73.)

On May 23, 2007, plaintiff had a spinal cord stimulator placed into the dorsal column for a trial period. (R. 363-64.) On May 25, 2007, the stimulator trial was removed. Thompson had tolerated the procedure well. (R. 367.)

**Psychological Impairments.**

Stephen R. Yerian, Psy.D. On February 12, 2004, Dr. Yerian, a clinical psychologist, interviewed and tested Thompson at the request of the Bureau of Disability Determination. Thompson lived by himself in his own home. (R. 192.)

On mental status examination, Thompson's mood was dysphoric, but he demonstrated a full range of affect. He described his mood as depressed. Thompson complained of difficulty sleeping and described problems with sleep onset and sleep maintenance. He reported being tearful at times. He had diminished energy and

reported feeling tired and fatigued most days. His psychomotor activity during the assessment appeared retarded. He felt worthless, hopeless, and helpless.

Despite reporting that he experienced panic attacks, Thompson did not demonstrate any symptoms of anxiety. (R. 195.)

Thompson was able to care for his personal hygiene and other activities of daily living. He reported being able to perform many household tasks, such as sweeping, cooking, dishwashing, and laundry, but his grandmother often helped with household tasks. (R. 196.)

Dr. Yerian diagnosed major depressive disorder, single episode, severe, without psychotic features; pain disorder associated with both psychological factors and a general medical condition; and a reading disorder. He assigned a current global assessment of functioning ("GAF") score of 45. Dr. Yerian concluded:

> Mr. Thompson's GAF rating is 45 or a serious level of functional impairment. Mr. Thompson demonstrated impairment in functional behaviors related to his depressive disorder and pain disorder that impairs his ability to sustain employment. He is persistently depressed with low motivation, fatigue, and anhedonia which impairs his ability to relate well to others. Such impairment is at a severity rating of 45. Mr. Thompson's functional severity is rated at 65, as indicated by his maintaining some meaningful interpersonal relationships and by his ability to perform some household tasks at home. Therefore Mr. Thompson's GAF is 45, which is the lower or the worse of the functional ratings.

(R. 198.) With respect to plaintiff's work-related mental abilities, Dr. Yerian stated:

> 1. Mr. Thompson's potential ability to relate to others, including co-workers and supervisors, does seem moderately limited at the present time due to the reported level of his depressive affect and

the alleged intensity of the painfulness. However, his reported work history indicates no significant problems in relating to others. The testing and his reported job history indicate that he is potentially capable of handling simple and less complex types of tasks. His ability to comprehend simple, concrete verbal instructions or details does not seem to be limited based on ability during the interview and testing to understanding verbal instructions. However, his reading abilities are markedly limited for comprehending verbal instructions that are abstract or detailed. His ability to recall verbal instructions or details seemed only mildly limited by inefficient free recall abilities. However, learning and memory improves with repeated opportunities to learn the information ,and his recall improves when provided with cues and choices to aid his recall of information.

2.      Mr. Thompson's mental ability to understand and follow instructions does seem to be moderately limited based upon his psychometric testing and his observed performance during the clinical interview, mental status examination, and testing. He appears to be able to comprehend very simple and routine ADL tasks at home. However, Mr. Thompson is assessed as moderately limited in his ability to understand and follow instructions that are complex, abstract, or detailed based upon his level of intelligence and his less efficient reading abilities. He does not seem to be limited in his ability to understand and follow instructions that are very simple, concrete, and not detailed. His ability to learn new information does seem moderately impaired or limited with only limited learning opportunities.

3.      Mr. Thompson's mental ability to maintain attention and concentration to perform even simple repetitive tasks did not seem to be limited. He was not distractible or inattentive during the testing. However, his persistence on task seems moderately limited due to his level of depression, fatigue, and anhedonia. His pace and cognitive processing speed is slow relative to same-aged peers, and his level of psychomotor retardation and fatigue tend to slow his performance; thus his ability to maintain pace on tasks is moderately limited.

4.      Mr. Thompson's mental ability to withstand the stress and pressures associated with day-to-day work activity seems to be

moderately limited. He reports problems in dealing with stress on a daily basis due to his level of depression and painfulness. He shows moderate limitations in the area of relating to others.

(R. 198-99.)

Carl L. Tishler, Ph.D. On March 2, 2004, Dr. Tishler completed a mental residual functional capacity assessment. (R. 201-03.) With respect to understanding and memory, Thompson was not significantly limited in any area. (R. 201.) With respect to sustained concentration and persistence, Thompson was moderately limited in his ability to carry out detailed instructions and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 201-02.)

With respect to social interaction, plaintiff's ability to interact appropriately with the general public was moderately limited. (R. 202.) Thompson's ability to respond appropriately to changes in the work setting were also moderately limited. *Id.* Dr. Tishler concluded that Thompson's allegations were only partially credible because there was no evidence supporting his allegations of panic attacks and anxiety. (R. 203.)

On November 26, 2004, Guy G. Melvin, Ph.D. reviewed the evidence of record and concurred in the findings of Dr. Tishler. *Id.*

Dr. Tishler also completed a psychiatric review technique. (R. 204-16.) He determined that plaintiff had a reading disorder and major depression. (R. 205, 207.) Dr. Tishler opined that Thompson had moderate restriction of activities of daily living and mild difficulties in maintaining social functioning. Thompson had no difficulties in

maintaining concentration, persistence, or pace and no episodes of decompensation. (R. 214.)

Janet Clark, Ph.D.  In a July 24, 2005 letter, Dr. Clark, a psychologist,  provided a narrative report concerning her treatment of Thompson. Dr. Clark began treating plaintiff on August 26, 2003. The results of the Minnesota Multiphasic Personality Inventory (MMPI) were consistent with a diagnosis of major depression, severe. Dr. Clark saw plaintiff for individual psychotherapy. Thompson exhibited feelings of depression, anhedonia, fatigue, decreased sleep, nonrestorative sleep, poor appetite, low self-esteem, poor concentration and memory, irritability, brooding, and feelings of helplessness and hopelessness. Thompson also reported anxiety with panic attacks when he has to leave his home. (R. 274.) He experienced an upset stomach, restlessness, social isolation, and perceived pain. He was suspicious and distrustful of others. He depended on family members for physical and emotional support. (R. 274-75.)

After 28 sessions of individual psychotherapy, Thompson remained symptomatic with a guarded prognosis. Pain related to RSD negatively impacted his psychological well-being and increased his depression. Dr. Clark opined that Thompson was totally disabled from work. (R. 275.)

Dr. Clark administered the Connors' Continuous Performance Test (CCPT) on June 28, 2005, which indicated that he has a clinically significant attention problem with a confidence level of 07-.9 out of 100, which is a very high degree of confidence. Mr. Thompson's performance on this simple, repetitive test was slow and erratic, and

Thompson was inaccurate in his responses. There were signs of impulsiveness and of vigilance limitations. He was not able to maintain concentration and attention over time. Within the fourteen minute test, Thompson's reaction times became considerably slower and less consistent. (R. 275-76.)

Dr. Clark found that plaintiff had extreme restriction of daily activities and marked difficulties in maintaining social functioning. She also opined that plaintiff had extreme deficiencies in concentration, persistence, or pace which resulted in failure to complete tasks in a timely manner. (R. 293.)

**Administrative Law Judge's Findings.**

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.

2. The claimant has not engaged in substantial gainful activity since April 28, 2001, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe combination of impairments: residual of left ankle fracture, reflex symptomatic dystrophy in left leg and depression (20 CFR 404.1520(C) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work except that the claimant cannot climb ropes, ladders or scaffolds, work at unprotected heights, around dangerous moving machinery or open flames and bodies of water. Because of the claimant's depression, he should be limited to

simple, unskilled work that require no more than superficial
contact with supervisors, co-employees and the general public.

6.    The claimant is unable to perform any past relevant work (20 CFR
      404.1565 and 416.965).

7.    The claimant was born on August 11, 1965 and was 35 years old,
      which is defined as a younger individual age 18-44, on the alleged
      disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to
      communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the
      claimant's past relevant work is unskilled (20 CFR 404.1568 and
      416.968).

10.   Considering the claimant's age, education, work experience, and
      residual functional capacity, there are jobs that exist in significant
      numbers in the national economy that the claimant can perform (20
      CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.   The claimant has not been under a disability, as defined in the
      Social Security Act, from April 28, 2001 through the date of this
      decision (20 CFR 404.1520(g) and 416.920(g)).

(R.18-25.)

        **Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings

of the Commissioner as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389,

401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is

"'more than a mere scintilla.'"  *Id*.  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir.

1976).  The Commissioner's findings of fact must be based upon the record as a whole.

*Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**   Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- <u>The administrative law judge's erred in evaluating the opinion of the treating pain specialist</u>.  The administrative law judge concluded that Thompson could perform sedentary work as long as he avoided hazards. In reaching this conclusion, the administrative law judge rejected the opinion of Dr. Sardo, who indicated that plaintiff could only lift five pounds, walk or stand for one-half hour in an eight-hour workday, or sit for one hour in an eight-hour workday. Dr. Sardo indicated that plaintiff needed to keep his leg elevated. Plaintiff argues that the administrative law judge improperly rejected Dr. Sardo's opinion because it was conclusory and provided minimal explanation of the evidence he relied upon in forming that opinion. Plaintiff maintains that the administrative law judge's cursory analysis failed to consider Dr. Sardo's detailed

medical records that documented his RSD. Plaintiff also argues that the administrative law judge did not rely on any other medical opinion to reach his conclusions, which was error as he is not a medical expert.

- <u>The administrative law judge's erred in evaluating the opinion of the treating psychologist</u>. Plaintiff argues that the administrative law judge provided a cursory reference to Dr. Clark's opinion and determined that her opinion was inconsistent with the evidence of record. The administrative law judge failed to consider that Dr. Clark saw Thompson over a period of months to evaluate his impairment, that she administered specialized testing, and that her opinion regarding Thompson's ability to handle stress was supported by Dr. Yerian's findings.

- <u>The administrative law judge failed to properly evaluate Thompson's allegations of pain</u>. Plaintiff argues that although the administrative law judge cited the appropriate rules and regulations concerning the evaluation of pain and other subjective symptoms, the administrative law judge failed to apply the relevant factors to Thompson. Plaintiff further argues that the administrative law judge was mistaken in his belief that the physical indicia of RSD were not strong in this case. Plaintiff maintains that where allegations of pain cannot be completely explained by physical symptoms, the effects of one's mental impairment must be considered.

**Analysis.**

Treating Doctors' Opinions.  Plaintiff argues that the Administrative Law Judge erred in rejecting the opinions of Dr. Sardo and Dr. Clark that Thompson was disabled based on RSD and depression.

Treating Doctor: Legal Standard.  A treating doctor's opinion on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record.  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The treating doctor has had the opportunity to observe his patient's impairments over the course of time.

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable."  42 U.S.C. §423(d)(1)(A).  Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence.  *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004)*; Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v.*

*Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527.

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision. *Id.* Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled. 20 C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory findings and

what they signify." *Id.* When the treating source's opinion "is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight . . . ." The Commissioner's regulations further provide that the longer a doctor has treated the claimant, the greater weight the Commissioner will give his or her medical opinion. When the doctor has treated the claimant long enough "to have obtained a longitudinal picture of your impairment, we will give the source's [opinion] more weight than we would give it if it were from a non-treating source." 20 C.F.R. §404.1527(d)(2)(I).

The Commissioner has issued a policy statement about how to assess treating sources' medical opinions. Social Security Ruling 96-2p. It emphasizes:

1.  A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2.  Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3.  Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4.  Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5.  The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an

understanding of the clinical signs and laboratory findings and what they signify.

6.    If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7.    A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

The case law is consistent with the principals set out in Social Security Ruling 96-2p. A broad conclusory statement of a treating physician that his patient is disabled is not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). The Commissioner must make the final decision on the ultimate issue of disability. *Warner v. Commissioner of Social Security,* 375 F.3d at 390; *Walker v. Secretary of Health & Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992);

*Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

Treating Doctor: Discussion.  With respect to Dr. Sardo's opinion, the administrative law judge stated:

> Although one of the claimant's treating physicians, Dr. James Sardo, opined that the claimant would not be prompt and regular in attendance at work and that he would likely miss work more than three times a month, he provided a vague explanation for his opinion indicating only that the claimant's "pain/depression would inhibit work ability". Dr. Sardo did not ascribe specific limitations that would preclude the claimant's ability to sustain work on a regular and ongoing basis. Dr. Sardo also opined that the claimant could not stand/walk for more than ½ hour a workday or sit for more than 1 hour a workday. However, the undersigned finds that opinion expressed by Dr. Sardo is quite conclusory, providing minimal explanation of the evidence he relied on in forming that opinion. Moreover, the claimant has expressed an interest in returning to work and has stated that he may be able to tolerate sedentary-type activity, which implies that the claimant's endurance for sitting is not quite as limited as Dr. Sardo would suggest (Exhibit 11F, p. 29).

(R. 22.) Here, the administrative law judge failed to discuss the nature and extent of the treatment relationship, supportability, consistence, and speciality, which are factors that weigh in favor of giving weight to Dr. Sardo's opinion.

The administrative law judge determined that plaintiff had the physical residual functional capacity to perform sedentary work. Because of his difficulty with ambulation, the administrative law judge further limited him from jobs which involved climbing ropes, ladders or scaffolds or working at unprotected heights, around dangerous machinery or open flames and bodies of water. Although the administrative law judge disregarded the opinion of Dr. Sardo, he does not indicate the medical

opinion on which he does rely for formulating the residual functional capacity. The administrative law judge considered the opinion of the State Agency medical consultant, but he gave little weight to that opinion because new evidence had been submitted subsequent to that opinion. (R. 23.)[2]

Rather than basing his opinion on medical evidence in the record, the administrative law judge appears to have relied on his belief that plaintiff wanted to return to work and suggested that he might be able to tolerate sedentary work activity. Although Dr. Kakde thought Thompson could perform sedentary work, he indicated that Thompson should only work two hours a day and increase hours as tolerated. In January 2003, Thompson underwent physical therapy, but on June 17, 2003, Thompson indicated that persistent pain prevented him from continuing with vocational rehabilitation. Plaintiff's attempts to seek employment, and a desire to do so, does not mean that the administrative law judge can formulate a residual functional capacity without reliance on medical evidence in the record.

With respect to Dr. Clark's opinion, the administrative law judge stated:

The undersigned has also given consideration to the psychiatric assessment provided by Dr. Janet Clark, who provided psychotherapy to the claimant for a period of 2 years (Exhibit 10F). Dr. Clark opined that the claimant has extreme limitations in his activities of daily living, marked difficulties in maintaining social functioning and extreme deficiencies in concentration, persistence or pace (Exhibit 10F, p. 58). The undersigned finds that Dr. Clark's opinion is inconsistent with the evidence of record, including Dr. Yerian's findings, which demonstrate that the claimant is

[2]As indicated above at footnote 1, that opinion was based, at in part, on a misreading of the medical evidence.

not significantly limited in his ability to maintain concentration as he was not distractible or inattentive during psychological testing and was able to follow simple instructions. Furthermore, Dr. Clark's opinion that the claimant has "extreme limitations" in activities of daily living is inconsistent with the claimant's own statements on this issue. Although Dr. Clark opined that the claimant is totally disabled from full-time or part-time work, this is an issue reserved to the Commissioner for determination.

(R. 23.)

The administrative law judge mischaracterizes Dr. Yerian's findings with regard to Thompson's ability to maintain concentration. Dr. Yerian concluded that although Thompson was not distractible or inattentive during the testing, his persistence on task was moderately limited as a result of his depression, fatigue, and anhedonia. Dr. Yerian stated that Thompson's "pace and cognitive processing speed is slow relative to same-aged peers, and his level or psychomotor retardation and fatigue tend to slow his performance; thus, his ability to maintain pace on tasks is moderately limited." (R. 199.)

The administrative law judge also failed to discuss the findings of Drs. Clark and Yerian that plaintiff was extremely or markedly limited in his ability to withstand the stress and pressures associated with day-to-say work activity. (R. 276, 199).

Thompson's treators diagnosed RSD and his long-term treating pain specialist has stated the opinion that he is disabled. The administrative law judge attempted to discount that opinion, but he did not support it by reference to contrary medical evidence. On the other hand, the administrative law judge's assertion that Dr. Sardo's opinion is not supported by his treatment notes does not fairly assess those notes.

Contrary to the administrative law judge's assertion, those notes do not document that Thompson's pain complaints were greatly reduced when he took pain medication. Instead, they document that Thompson regularly took large doses of pain medication but mostly reported that his pain levels were 8-10 on a scale of 1-10.

In addition to the physical pain caused by RSD, Thompson was a laborer who graduated from high school taking classes for the learning disabled. The psychological tests and reports from his treating psychologist and examining psychologists all demonstrate that Thompson has significant non-exertional impairments.

<u>Credibility Determinations: Controlling Law</u>. Pain is an elusive phenomena. Ultimately, no one can say with certainty whether another person's subjectively disabling pain precludes all substantial gainful employment. The Social Security Act requires that the claimant establish that he is disabled. Under the Act, a "disability" is defined as "inability to engage in any substantial gainful activity <u>by reason of any medically determinable or mental impairment</u> which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §423(d)(1)(A) (emphasis added).

Under the provisions of 42 U.S.C. §423(d)(5)(A):

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be

31

expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or other laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

The Commissioner's regulations provide:

(a) *General.* In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in §404.1528(b) and (c). By other evidence, we mean the kinds of evidence described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the

> intensity and persistence of your pain or other symptoms
> which may reasonably be accepted as consistent with the
> medical signs and laboratory findings), would lead to a
> conclusion that you are disabled.  In evaluating the intensity
> and persistence of your symptoms, including pain, we will
> consider all of the available evidence, including your
> medical history, the medical signs and laboratory findings
> and statements about how your symptoms affect you.
> (Section 404.1527 explains how we consider opinions of your
> treating source and other medical opinions on the existence
> and severity of your symptoms, such as pain.)  We will then
> determine the extent to which your alleged functional
> limitations and restrictions due to pain or other symptoms
> can reasonably be accepted as consistent with the medical
> signs and laboratory findings and other evidence to decide
> how your symptoms affect your ability to work.

20 C.F.R. §404.1529(a).

In *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986) the Sixth Circuit established the following test for evaluating complaints of disabling pain.  First, the Court must determine "whether there is objective medical evidence of an underlying medical condition."  If so, the Court must then

> examine:  (1) whether objective medical evidence confirms
> the severity of the alleged pain arising from the condition; or
> (2) whether the objectively established medical condition is
> of such a severity that it can reasonably be expected to
> produce the alleged disabling pain.

*Duncan*, 801 F.2d at 853.  Any "credibility determinations with respect to subjective complaints of pain rest with the ALJ."  *Siterlet v. Secretary of Health and Human Services*, 823 F.2d 918, 920 (6th Cir. 1987).

<u>Credibility Determination: Discussion</u>.  The administrative law judge stated:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not entirely credible.

(R. 22.) Here, the administrative law judge failed to provide his rationale for declining to give credence to Thompson's allegations of pain, making it impossible for the Court to determine whether such finding his supported by substantial evidence.

For the reasons stated above the Magistrate Judge finds that the opinion of the administrative law judge is not supported by substantial evidence and RECOMMENDS that the decision of the Commissioner of Social Security be REVERSED and that Thompson be awarded benefits from April 28, 2001 through the end of 2006.  In June 2007, Thompson was waiting for a permanent stimulator placement. If the Commissioner believes that Thompson's medical condition improved, then a new residual functional capacity should be formulated.

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District

Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v.*

*Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

*See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).


                       s/Mark R.  Abel
                       United States Magistrate Judge